IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CIV-23-00546-JD |
| ) | |
| CHRISTOPHER BRADSHAW, D.O., ) | |
| ) | |
| Defendant. ) | |
| ) | |

**ORDER**

Before the Court is the United States' Motion for Default Judgment ("Motion"). [Doc. No. 8]. Following the Clerk's Entry of Default on August 30, 2023 [Doc. No. 7], the United States seeks a default judgment and an assessment of civil penalties in excess of $646,800.00 but not more than $1,293,600.00 against Defendant Christopher Bradshaw, D.O., ("Dr. Bradshaw"), under Federal Rule of Civil Procedure 55(b)(2). Having reviewed the record and the United States' submissions, and for the reasons stated below, the Court grants the Motion to the extent set forth in this Order.

**I.     BACKGROUND**

The United States alleges that Dr. Bradshaw, a United States Drug Enforcement Administration ("DEA") registrant,[1] violated the Comprehensive Drug Abuse Prevention and Control Act of 1970 (also known as the Controlled Substances Act) ("CSA"), 21

---

[1] Physicians who dispense or prescribe controlled substances must register with the DEA. *See* 21 U.S.C. §§ 822, 824; 28 C.F.R. § 0.100.

U.S.C. § 801, *et seq.*, by issuing prescriptions for Schedule II controlled substances outside the course of usual professional practice.

The record reflects that Dr. Bradshaw was timely served and that the time for him to answer or otherwise respond has expired. Dr. Bradshaw neither appeared nor filed any motion or pleading, and the Clerk entered the default of Dr. Bradshaw under Federal Rule of Civil Procedure 55(a) on August 30, 2023. *See* Clerk's Entry of Default [Doc. No. 7]. The United States filed the Motion on April 5, 2024. [Doc. No. 8]. The Motion reflects that it was mailed to Dr. Bradshaw. *See id.* at 17. No timely response to the Motion has been made, and under Local Civil Rule 7.1(g), the Court deems the Motion confessed. On June 20, 2024, the Court entered an Order setting an evidentiary hearing on the Motion for August 30, 2024. [Doc. No. 9]. The Order permitted the United States to supplement the record and advised that if the supplementation was sufficient, the Court would strike the evidentiary hearing. *See id.*

In accordance with the Order, the United States filed its Response to the Court's Order Setting Evidentiary Hearing on August 5, 2024 ("Supplement"). [Doc. No. 10]. The Supplement reflects that it was mailed to Dr. Bradshaw. *See id.* at 6. The Court struck the hearing as a result of the Supplement. *Cf. id.* at 5 ("The United States contends . . . that no purpose would be served by having the evidentiary hearing . . . [and] respectfully requests that the Court vacate the evidentiary hearing . . . .").

II.     **STANDARD FOR ENTRY OF DEFAULT JUDGMENT**

Federal Rule of Civil Procedure 55 sets out a two-step process for a default judgment. First, a party must obtain the Clerk's entry of default. *See* Fed. R. Civ. P.

2

55(a); *see also Garrett v. Seymour*, 217 F. App'x 835, 838 (10th Cir. 2007) (unpublished) (explaining that entry of default by the court clerk is a prerequisite for the entry of a default judgment under Rule 55(b)(1)). Second, the party must request the clerk to enter default judgment when the "claim is for a sum certain or a sum that can be made certain by computation," Fed. R. Civ. P. 55(b)(1), or "[i]n all other cases, the party must apply to the court for a default judgment," Fed. R. Civ. P. 55(b)(2).

After an entry of default, a defendant cannot defend a claim on the merits. *See Olcott v. Del. Flood Co.*, 327 F.3d 1115, 1125 (10th Cir. 2003). Instead, the defendant, "by his default, admits the plaintiff's well-pleaded allegations of fact." *Id.* (quoting *Jackson v. FIE Corp.*, 302 F.3d 515, 524 (5th Cir. 2002) (noting that "[a] default judgment is unassailable on the merits")); *see also Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1414 (9th Cir. 1990) ("[A] default judgment generally precludes a trial of the facts except as to damages."). A trial court has broad discretion in deciding whether to enter a default judgment. *See Grandbouche v. Clancy*, 825 F.2d 1463, 1468 (10th Cir. 1987).

"Even after default, it remains for the court to consider whether the unchallenged facts constitute a legitimate basis for the entry of a judgment since a party in default does not admit conclusions of law." *Mathiason v. Aquinas Home Health Care, Inc.*, 187 F. Supp. 3d 1269, 1274 (D. Kan. 2016) (citation omitted). Moreover, a default judgment does not establish the amount of damages, and a plaintiff must establish that the amount requested is reasonable under the circumstances. *See id.* at 1274–75 ("Damages may be awarded only if the record adequately reflects the basis for [the] award via a hearing or a

3

demonstration by detailed affidavits establishing the necessary facts." (citation omitted)). "Undisputed facts set forth by the moving parties in affidavits and exhibits are also accepted as true." *Reg'l Dist. Council v. Mile High Rodbusters, Inc.*, 82 F. Supp. 3d 1235, 1242–43 (D. Colo. 2015).

## III.  DISCUSSION

### A. Jurisdiction

In determining whether a default judgment is warranted, the Court must first consider whether it has jurisdiction over the subject matter and the defendant. *See Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1203 (10th Cir. 1986). A federal court's lack of subject matter jurisdiction cannot be waived by the parties, nor can it be conferred by the parties' agreement. *See id.* at 1202. Moreover, defects in personal jurisdiction are not waived by default when a party fails to appear or respond. *See id.* The plaintiff bears the burden of proving personal jurisdiction before a default judgment may be entered. *See Bixler v. Foster*, 596 F.3d 751, 761 (10th Cir. 2010) ("Personal jurisdiction over the defendant is required before a default judgment in a civil case may be entered."); *see also Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011) (explaining that "[t]he plaintiff bears the burden of establishing personal jurisdiction"). Such "burden can be met by a prima facie showing" based on pleadings and affidavits. *See Shrader*, 633 F.3d at 1239.

Based on the record, the Court finds it has personal jurisdiction over Dr. Bradshaw. Dr. Bradshaw was personally served with a copy of the summons and complaint on July 28, 2023, at his residence in Wayne, Oklahoma, in accordance with

4

Federal Rule of Civil Procedure 4(e)(2)(A). [Doc. No. 5-1 at 2]. Dr. Bradshaw also resides within this judicial district, and at the time relevant to this case, he maintained a DEA-registered address and regularly practiced medicine in the Western District of Oklahoma. Compl. [Doc. No. 1] at ¶¶ 5, 8–9, 27–28.

Further, the Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, and 1355 and 21 U.S.C. § 842(c)(1)(A) because this matter arises under federal law, was commenced by the United States, and involves the assessment of monetary civil penalties under an act of Congress.

**B. Liability**

The Court next considers whether the unchallenged facts constitute a legitimate cause of action. As a result of Dr. Bradshaw's default, the Court accepts the well-pleaded factual allegations in the United States' Complaint as true. *See Tripodi v. Welch*, 810 F.3d 761, 764 (10th Cir. 2016) (explaining that after default is entered, "a defendant admits to a complaint's well-pleaded facts and forfeits his or her ability to contest those facts"); *United States v. Craighead*, 176 F. App'x 922, 924 (10th Cir. 2006) (unpublished) ("The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established.") (unpublished) (quoting *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)).

The United States' Complaint, Motion, and Supplement and evidence attached thereto establish that from March 29, 2019 to May 4, 2020, Dr. Bradshaw issued sixteen prescriptions for Schedule II controlled substances without documentation, physical

5

exam, or the establishment of a physician-patient relationship with the recipients.[2] This is unprofessional conduct in contravention of federal and Oklahoma law (Okla. Stat. tit. 59, § 637(A)(2)(g); Okla. Admin. Code § 510:5-7-1), is outside the course of usual professional practice, and violates sections 829 and 842(a)(1) of the CSA. *See* 21 U.S.C. §§ 829, 842(a)(1); *see also* 21 C.F.R. § 1306.04. Accordingly, the Court finds that default judgment is appropriate.

### C. Damages

Having established liability, the Court must ascertain damages. Under the CSA, Dr. Bradshaw is liable for civil monetary penalties. Section 842(c) provides that every § 829 violation carries a civil penalty of up to $25,000. *See* 21 U.S.C. § 842(c)(1)(A). "For civil penalties assessed after February 12, 2024, whose associated violations occurred after November 2, 2015, the civil monetary penalties provided by law . . . are adjusted as set forth in the seventh column of table 1" in 28 C.F.R. § 85.5(d). *See* 28 C.F.R. § 85.5(a), (d). Thus, Dr. Bradshaw is liable for civil monetary penalties up to $80,850 for each of the sixteen violations, making his maximum potential penalty $1,293,600. The Court must now determine the appropriate civil penalty to impose.

---

[2] The evidence of record includes an affidavit from DEA Diversion Investigator Michele Sanders, who was the lead investigator in the DEA's investigation of Dr. Bradshaw [Doc. No. 10-1 at 1–5]; copies of the sixteen prescriptions issued by Dr. Bradshaw [Doc. No. 10-1 at 6–21]; a Supervising Physician Contract signed by Dr. Bradshaw, reflecting a contract between Bradshaw Medical Group, PLLC, and an Advanced Practice Registered Nurse ("NP") [Doc. No. 10-1 at 22–23]; a complaint filed by the Oklahoma State Board of Osteopathic Examiners ("Osteopathic Board") on February 15, 2024, against Dr. Bradshaw [Doc. No. 10-1 at 24–28]; and an Order of Suspension of License issued by the Osteopathic Board against Dr. Bradshaw on June 20, 2024 [Doc. No. 10-1 at 29–33].

"When 'determining monetary penalties under § 842(c), district courts have frequently considered four factors: (1) the level of defendant's culpability, (2) the public harm caused by the violations, (3) defendant's profits from the violations, and (4) defendant's ability to pay a penalty.'" *United States v. Patka*, CV 117-062, 2018 WL 3236050, at *2 (S.D. Ga. July 2, 2018) (quoting *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 399 (2d Cir. 2004) (citing cases)). The Court did not find any Tenth Circuit authority adopting or favorably citing the factors in *Advance Pharmaceutical*, and the United States indicated it had not either. *See* Supplement at 1 n.1. However, the Court notes that the United States District Court for the Northern District of Oklahoma relied on and applied these same factors in determining civil monetary penalties for a physician who violated 21 U.S.C. §§ 829(b) and 842(a)(1) and 21 C.F.R. §§ 1306.04 and 1306.05. *See United States v. Blackmon*, Case No. 16-CV-129-JED-JFJ, 2017 WL 5565675, at *2, 5–6 (N.D. Okla. Nov. 19, 2017). The physician in *Blackmon*, among other violations, permitted registered nurses to examine patients and prescribe Schedule III and IV controlled substances in his absence, outside the course of his professional practice, and without him establishing a doctor-patient relationship. *See id.* at *2.

Thus, the Court draws guidance from these factors in exercising its discretion in determining the appropriate civil monetary penalties to impose under the CSA. *See id.*; *see also Advance Pharm.*, 391 F.3d at 399. The Court does not, however, take these factors to be exclusive. *See United States v. Glob. Distribs., Inc.*, 498 F.3d 613, 620–22 (7th Cir. 2007) (also applying the *Advance Pharmaceutical* factors but noting they "should not be taken as exclusive").

### 1. *The level of Dr. Bradshaw's culpability*

The Court agrees with the United States that the level of Dr. Bradshaw's culpability weighs in favor of a significant penalty. The evidence shows that Dr. Bradshaw's sixteen violations "were deliberate and persistent," or at the very least reckless, spanning roughly thirteen months and affecting six individuals.[3] *See Advance Pharm.*, 391 F.3d at 399.

Dr. Bradshaw illegally prescribed Schedule II controlled substances, including Norco, Adderall, and Vyvanse, which have "a high potential for abuse" and "may lead to severe psychological or physical dependence." *See* 21 U.S.C. § 812(b)(2); 21 C.F.R. § 1308.12(a), (b)(1)(vi), (d)(1), (d)(5). Adderall (the combination of dextroamphetamine and amphetamine) is a stimulant used to control the symptoms of attention deficit hyperactivity disorder ("ADHD") and can also be used to treat narcolepsy.[4] Vyvanse (lisdexamfetamine) is a stimulant used to control the symptoms of ADHD and can be used to treat binge eating disorders.[5] According to the U.S. Centers for Disease Control and Prevention ("CDC"), stimulant-involved overdose deaths increased by 317 percent

---

[3] It appears that the first violation occurred on March 29, 2019, and the last one occurred on May 4, 2020. *See* [Doc. No. 10-1 at 6–21]; *see also* Motion at 4 (table).

[4] *See* NIH National Library of Medicine, https://medlineplus.gov/druginfo/meds/a601234.html (last visited Oct. 15, 2024).

[5] *See* NIH National Library of Medicine, https://medlineplus.gov/druginfo/meds/a607047.html (last visited Oct. 15, 2024).

from 2013 through 2019.[6] Norco (acetaminophen with hydrocodone) is an opioid prescribed to treat pain.[7] According to Norco's 2019 drug label, it "exposes patients and other users to the risks of opioid addiction, abuse, and misuse, which can lead to overdose and death," and practitioners are advised to "[a]ssess each patient's risk prior to prescribing" and "[m]onitor for respiratory depression."[8]

Despite these known health risks and potential for abuse, Dr. Bradshaw disregarded the most basic requirements of medical practice by prescribing these controlled substances without individually assessing and examining the patients. From February 2019 to 2021, Dr. Bradshaw was the supervising physician of record for NP, who was the only practitioner at a clinic in Oklahoma City. [Doc. No. 10-1 at 3–4]; Compl. ¶ 30. Under Oklahoma law, NP was not authorized to prescribe Schedule II controlled substances. [Doc. No. 10-1 at 3]; Compl. ¶ 30. According to NP, Dr. Bradshaw never worked scheduled hours at the clinic, nor did he see any of the clinic's patients or keep charts or records on clinic patients. [Doc. No. 10-1 at 3]. Instead, Dr. Bradshaw signed prescription forms and provided them to NP, who completed the rest of the

---

[6] CDC, *The Stimulant Guide*, https://www.cdc.gov/overdose-prevention/about/stimulant-overdose.html#cdc_generic_section_6-the-stimulant-guide (last visited Oct. 15, 2024).

[7] NIH National Library of Medicine, https://medlineplus.gov/ency/article/002670.htm (last visited Oct. 15, 2024).

[8] *See* NORCO®, Hydrocodone Bitartrate and Acetaminophen Tablets, https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/040099s023lbl.pdf (last visited Oct. 15, 2024).

information on the prescriptions. *See id.* The evidence shows sixteen separate and distinct violations of the CSA. [Doc. No. 8-1 at 1–16]; [Doc. No. 10-1 at 6–21].

For example, on October 10, 2019, Dr. Bradshaw dispensed sixty Norco (hydrocodone) tablets to an individual with whom he had no physician-patient relationship. [Doc. No. 10-1 at 6]. That lack of relationship means that Dr. Bradshaw did not know whether the patient had a history of drug abuse, if he or she was taking other medication that could interact with the opioid, or why the patient needed such a large quantity of pills at once. Additionally, Dr. Bradshaw did not monitor patients after prescribing the substances nor document the patients' responses to the medication.

Congress enacted the CSA "to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances." *Gonzales v. Raich*, 545 U.S. 1, 12 & n.20 (2005). Congress was particularly focused on the "need to prevent the diversion of drugs from legitimate to illicit channels." *Id.* at 13 (citing *United States v. Moore*, 423 U.S. 122, 135 (1975) and H.R. Rep. No. 91-1444, at 22 (1970)). To effectuate its statutory goals, Congress formulated a closed regulatory system, which made it unlawful to manufacture, distribute, dispense, or possess any controlled substance unless authorized by the CSA. *See id.* (citing 21 U.S.C. §§ 841(a)(1), 844(a)). Physicians "'can be prosecuted under § 841 when their activities fall outside the usual course of professional practice,' or when their prescriptions are not for a 'legitimate medical purpose.'" *United States v. Wilson*, 98 F.4th 1204, 1216 (10th Cir. 2024) (citations omitted).

In addition to being subject to criminal prosecution and punishment, a physician who violates the CSA can be ordered to pay a civil monetary penalty, as evidenced above. "It is not unusual for statutes to provide for a heavy civil penalty, as an alternative to criminal punishment, to discourage objectionable activity and to insure adequate compensation." *Chapman v. United States*, 821 F.2d 523, 528 (10th Cir. 1987). Here, Dr. Bradshaw abdicated his responsibilities as a physician, and it is impossible to know if the patients took the medication he prescribed or diverted it to illegal distribution channels. Regardless, Dr. Bradshaw's recklessness and flouting of basic regulations and safeguards must be given considerable weight in determining the appropriate penalty.

### 2. *The public harm caused by Dr. Bradshaw's violations*

The United States does not present any specific evidence that Dr. Bradshaw's violations caused significant public harm. Here, the DEA was unable to determine whether there was any diversion, in part because of Dr. Bradshaw's failure to comply with the CSA's requirements. Certainly, as a licensed physician and a DEA registrant under the CSA, Dr. Bradshaw was aware of the potential side effects of the three Schedule II controlled substances he prescribed and the risk of abuse and diversion.

The United States offers the subsequent suspension of Dr. Bradshaw's medical license on June 20, 2024, as circumstantial evidence and support for its claims that Dr. Bradshaw's conduct was egregious and placed his patients and the public at risk of significant harm. Supplement at 1, 5; *see also* [Doc. No. 10-1 at 24–33]. Most of the conduct underlying the Osteopathic Board's findings appears to have occurred after the conduct underlying the sixteen violations here. With that said, the Osteopathic Board

found that Dr. Bradshaw had violated Oklahoma Osteopathic Medicine Act, Okla. Stat. tit. 59, § 620 et seq., by:

> (1) engaging in unprofessional and unethical conduct in his duties as an osteopathic physician, to wit: diverting and/or retaining CDS prescribed to patients to himself, abusing CDS at his place of employment and otherwise, leaving the emergency room unattended, mishandling confidential patient documentation and information, and being unwilling to see emergency room patients in person; (2) violating state and federal law on controlled dangerous substances, to wit: diverting and retaining CDS prescribed to patients; (3) being incapable of discharging the functions of an osteopathic physician in a manner consistent with the public's health, safety, and welfare, to wit: being unable to safely practice osteopathic medicine due to being addicted to Percocet and/or other CDS; and (4) being guilty of habitual addiction to habit-forming drugs, to wit: being addicted to Percocet and/or other CDS.

[Doc. No. 10-1 at 30]. Additionally, some of the conduct was similar in nature to the instant case and provides additional evidence of Dr. Bradshaw disregarding his duties as a licensed physician and placing his patients and the community at risk. *See generally id.* at 25–27. It provides further evidence of the need for the civil penalty to reflect deterrence.

### 3. Dr. Bradshaw's profits or benefit from his illegal scheme

As noted by the Seventh Circuit in *Global Distributors*, "[t]he *Advance* court did not use any specific formula, nor does any law, regulation, or decision require any particular ratio between civil penalties and profits." *Glob. Distribs.*, 498 F.3d at 621 (explaining that "civil penalties ought to bear some relation to the conduct being punished").

The government presents minimal evidence on this factor, attaching a Supervising Physician Contract between Bradshaw Medical Group, LLC, and NP, which was signed

12

by Dr. Bradshaw on July 13, 2020. [Doc. No. 10-1 at 22–23]. Thus, the agreement post-dates the sixteen violations. Nevertheless, NP told DEA Diversion Investigator Michele Sanders that Dr. Bradshaw became NP's supervising physician in February 2019. *See id.* at 3. Therefore, assuming the post-dated contract represents a comparable rate, the Court can draw the inference that Dr. Bradshaw received $7,300 in total profits from his illegal scheme. The contract represents monthly compensation of $500 for Dr. Bradshaw's role as NP's supervising physician. The sixteen violations occurred between March 29, 2019 and May 4, 2020, which represents approximately thirteen months ($500 multiplied by thirteen months equals $6,500). Additionally, the contract reflects that Dr. Bradshaw received $25 to $50 for each prescription; thus, that would be an additional $800 ($50 multiplied by sixteen prescriptions). Admittedly, the inferred profits of $7,300 appears to bear little relation to the conduct being punished. However, it is a factor, and the Court considers it here.

### 4. Dr. Bradshaw's ability to pay

The fourth factor is the defendant's ability to pay the penalty. The government asserts that it is Dr. Bradshaw's burden to produce evidence of an inability to pay civil penalties. *See* Motion at 14 (citing *United States v. Ahuja*, Civil Action No. 3:14-CV-1558 (JCH), 2017 WL 1807561, at *12–13 (D. Conn. May 5, 2017), *aff'd*, 736 F. App'x 20 (2d Cir. 2018) (unpublished) (citing *Motorola Credit Corp. v. Uzan*, 509 F.3d 74, 84 (2d Cir. 2007)). *Ahuja* was a contested damages case, so it was not a default judgment case as here. Seemingly recognizing this distinction, the government also contends that Dr. Bradshaw's failure to respond or defend this action results in "insufficient evidence

[for the Court] to make an informed judgment as to Dr. Bradshaw's financial situation"; therefore, "this factor is neutral." *Id.* at 15.

Other than the fact that Dr. Bradshaw has now lost his license to practice medicine, there is no evidence before the Court of his financial circumstances. The Order of Suspension indicates that Dr. Bradshaw's license is suspended until such time as conditions in the order have been fully completed, and the order does "not guarantee" that Dr. Bradshaw's license will be reissued. [Doc. No. 10-1 at 31–32]. Despite the minimal information on Dr. Bradshaw's ability to pay the penalty, the Court considers this factor in its analysis.

The Seventh Circuit has cautioned that the *Advance Pharmaceutical* factors "not be taken as exclusive" and that focusing on "profits alone" is "flawed" when such an approach "ignore[s] the social harm to which [the defendant's] conduct gave rise." *Glob. Distribs.*, 498 F.3d at 621–22. Here, the government concludes that taking the factors altogether "this case easily warrants a penalty in excess of the midpoint of the congressionally established range set forth in the CSA." Motion at 15. The government advises that most CSA civil penalty cases in this district have settled without litigation; thus, "this case presents the first opportunity for this Court to assess civil penalties in this context." *See id.* As a result, the government contends that the Court's order will impact the government's ability to advance the purposes and goals of the CSA, and that such order will "determine the deterrence value of Section 842(a)(1) in this judicial district." *See id.*

Given that the *Advance Pharmaceutical* factors are not exclusive, the Court agrees that deterrence is an appropriate factor for it to consider in assessing a civil penalty in this case, particularly considering Dr. Bradshaw was dispensing Schedule II controlled substances. The Court is also mindful that if Dr. Bradshaw had been criminally prosecuted and convicted, he would be subject to a possible term of imprisonment and/or a fine of up to $1,000,000. *See* 21 U.S.C. § 841.

However, contrary to the United States' arguments, the Court is deciding only the civil penalties in this case before it, not all other civil penalties in other cases that might be filed in this district. The penalties should be assessed on a case-by-case basis, depending on the facts and evidence before the Court. *Cf. Mathiason*, 187 F. Supp. 3d at 1275 ("Plaintiff must establish that the amount requested is reasonable under the circumstances.").

Here, the government has presented no evidence of the street value of the prescribed drugs or expert witness testimony discussing the negative public health consequences resulting from irresponsible opioid prescription practices, which is evidence presented in other district court cases evaluating the *Advance Pharmaceutical* factors. *Cf. Patka*, 2018 WL 3236050, at *2 (considering the government's "evidence of the street value of the prescribed drugs" and "expert witness testimony discussing the negative public health consequences resulting from irresponsible opioid prescription practices"). Additionally, as noted above, there is very little evidence about the profits or benefits Dr. Bradshaw derived from his illegal scheme or his financial circumstances. Finally, although the United States indicates that most CSA civil penalty cases in this

15

district settle without litigation, the terms of such settlements are not before the Court for comparison.

Accordingly, after considering the nonexclusive *Advance Pharmaceutical* factors, the evidence and record before it, and the importance of deterrence, the Court concludes in its discretion that a civil monetary penalty of $400,000.00 is appropriate. This amount reflects the egregiousness of Dr. Bradshaw's conduct, accounts for the risks associated with Schedule II controlled substances and the potential for public harm, accounts for the six patients who were prescribed the Schedule II controlled substances in sixteen separate instances, and provides meaningful deterrence against future infractions, but still accounts for the duration of the violations in terms of time period (i.e., roughly thirteen months) and number involved (sixteen violations) and the fact little information exists on Dr. Bradshaw's profits and ability to pay. This figure represents a $25,000 penalty for each of the sixteen violations and appears to be more in line with what other district courts have decided, while still accounting for the facts and evidence before this Court and the fact this case involves Schedule II controlled substances. *See Patka*, 2018 WL 3236050, at *1–2 (granting the motion of the United States for a default judgment in 2018 and, though the United States sought damages of $3.3 million, awarding $1.2 million civil penalty for 299 violations of § 829(a) for defendant doctor dispensing Schedule II controlled substances); *cf. Blackmon*, 2017 WL 5565675, at *6 (430 violations for Schedule III and IV controlled substances resulted in a $296,000 civil penalty in 2017 where the doctor stipulated to the violations); *Ahuja*, 2017 WL 1807561, at *13 (more than 1,000 violations for Schedule III, IV, and V controlled substances

16

spanning a three-year period resulted in a $200,000 civil penalty in 2017 where the doctor admitted liability).

## IV. **CONCLUSION**

For the reasons stated above, the Court GRANTS the United States' Motion for Default Judgment [Doc. No. 8] as set forth in this Order. The United States is entitled to judgment pursuant to Federal Rules of Civil Procedure 55(b) and 58(a) against Defendant Christopher Bradshaw, D.O., as follows:

(1) civil monetary penalties in the amount of $400,000.00 pursuant to 21 U.S.C. § 842(c)(1)(A) and 28 C.F.R. § 85.5.

IT IS SO ORDERED this 17th day of October 2024.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE